#### IN THE UNITED STATES DISTRICT COURT
#### DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Safelite Group, Inc.<br><br>            Plaintiffs,<br>   v.<br><br>Kimberly Hall<br><br>            Defendant. | Case 2:23-cv-3674-RMG<br><br>**ORDER AND OPINION** |

This matter is before the Court on Plaintiff's motion for partial summary judgment (Dkt. No. 44). Defendant responded in opposition (Dkt. No. 45), and Plaintiff replied (Dkt. No. 46). For the reasons set forth below, the Court denies Plaintiff's motion.

**I.   Background**

On January 4, 2019, Plaintiff purchased a competing auto glass repair and replacement company Glasspro. (Dkt. No. 45-1 at 1). Defendant was employed by GlassPro at the time of the acquisition as a Marketing Agency Manager ("MAM") and assumed that same position at Safelite after the acquisition. (*Id.* at 1). As a MAM, Hall was responsible for increasing sales by developing, growing, and maintaining relationships with referral sources and customers, which are primarily insurance agents operating within her assigned territory. (Dkt. No. 15-1 at 2).

In order to continue her employment after the acquisition, Plaintiff notified Defendant that she must sign a contract titled "Non-Competition, Non-disclosure, Non-solicitation, and Assignment of Inventions Agreement" (Dkt. No. 45-1 at 1-2). Signing the agreement did not result in any pay raise or additional compensation. (Dkt. No. 45 at 2). The Agreement included an obligation not to disclose confidential information:

> Associate recognizes that Associate's position with Employer is one of trust and confidence. Associate understands and acknowledges that during the course of employment with Employer, Associate may have access to, or be in possession of Confidential Information of Employer. Associate understands that there is independent economic value in not having Employer's Confidential Information disclosed to others in the industry. Therefore:
>
> a. Associate agrees not to directly or indirectly use, divulge or disclose Confidential Information to any unauthorized person employed by Employer or to any individual no employed by Employer, or for Associate's own benefit or for the benefit of any person other than Employer, either during or after Associate's employment.
>
> b. Associate's obligations to maintain the confidentiality of Confidential Information are unconditional. Associate may reveal, divulge or disclose Confidential Information only with the prior written consent of Employer.

(Dkt. No. 1-1). The Agreement defined "Confidential Information as follows:

> b. "Confidential Information" means any information or compilation of information that Associate receives from Employer, becomes aware of, learns or develops during the course of employment which is generally not known, or readily ascertainable by proper means, by persons who are not employees of Employer. Confidentiality Information includes, but is not limited to, information relating to research, development, Inventions, trade secrets, manufacture, purchasing, accounting, engineering, marketing, merchandising and selling as well as information regarding Employer's customers, suppliers, vendors, and business partners. Confidential Information also includes information conceived, originated, discovered or developed in whole or in part by Associate as a consequence of or through employment with Employer.

(*Id.*).

The Agreement also states that Ohio law shall apply. (*Id.*)

On March 27, 2020, Plaintiff furloughed Defendant from Safelite. (Dkt. No. 17-1). Plaintiff stated defendant would "not report to work, and [] will not be paid." (*Id.*) Plaintiff stated that Defendant's "access to Safelite systems will be suspended . . . because you are not permitted to

work during a furlough." (*Id.*) Plaintiff told Defendant that she was "eligible to file for state unemployment benefits" and that she "must state the reason for furlough is 'lack of work' or 'temporary layoff' –not a leave of absence." (*Id.* at 15). In July 2020, Defendant resumed her prior duties for Plaintiff. (Dkt. No. 17-1 at 3).

In April 2023, Defendant was contacted by Driven Brands, Inc, a competitor to Plaintiff, regarding Defendant's employment. (Dkt. No. 44-2 at 8-11). Defendant signed an offer letter accepting employment with Driven on May 5, 2023. (*Id.*) Defendant notified Safelight of her resignation on May 19, 2023 and began working for Driven on May 22, 2023. (*Id.*)

After Plaintiff became aware that Defendant was working for Driven, Plaintiff preserved and searched Defendant's work email, discovering that during the final weeks of her employment Plaintiff sent emails and attachments to the personal email account belonging to her husband. (Dkt. No. 15-1 at 5). Plaintiff also contends that Defendant transferred information from her Safelite-owned phone to her Driven-owned phone, including record summaries and notes from her meeting with insurance agents and business contacts. (Dkt. No. 43 at 10-11).

Plaintiff now moves for partial summary judgment on its claim for breach of contract based on Defendant's breach of the parties' confidentiality agreement. (Dkt. No. 44). Defendant responded in opposition, (Dkt. No. 45), and Plaintiff replied (Dkt. No. 46). The matter is now ripe for the Court's review.

## II.    Standard

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those

3

facts." *Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross,* 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324, 106 S.Ct. 2548. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.,* 190 F.3d 285, 287 (4th Cir. 1999)).

### III. Discussion

#### A. Choice of Law

Plaintiff argues that the choice of law provision in the contract is valid and therefore Ohio law applies. Defendant argues that South Carolina choice of law rules involving restrictive covenants demand application of South Carolina, regardless of any choice of law agreement, because South Carolina has a public policy interest in construing restrictive covenants.

"Generally, under South Carolina choice of law principles, if the parties to a contract specify the law under which the contract shall be governed, the court will honor this choice of law." *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 728 (D.S.C. 2007) (citation omitted). "[A]bsent a

strong public policy reason, or lack of substantial relation . . . , [a] choice of law provision will be honored." *Russell v. Wachovia Bank, N.A.*, 578 S.E.2d 329, 336 (S.C. 2003).

> [U]nder the public policy exception, the Court will not apply foreign law if it violates the public policy of South Carolina. [F]oreign law may not be given effect in this State if it is against good morals or natural justice. Examples of cases against good morals and natural justice are prohibited marriages, wagers, lotteries, racing, contracts for gaming or the sale of liquors, and others. [T]he fact that the law of two states may differ does not necessarily imply that the law of one state violates the public policy of the other.

*Nash v. Tindall Corp.*, 650 S.E.2d 81, 83-84 (S.C. Ct. App. 2007) (internal quotation marks and citations omitted); *accord Boone v. Boone*, 345 S.C. 8, 13 (2002).

By its own terms, the Agreement is governed by Ohio law. Under Ohio law, continued employment is sufficient consideration for an employee's post-employment negative covenants. *Lake Land Empl. Group of Akron, LLC v. Columber*, 101 Ohio St. 3d 242, 246 (Ohio 2004). South Carolina courts regard noncompetition agreements with "high disfavor." *Nucor Corp. v. Bell*, 482 F.Supp.2d 714, 728. The South Carolina Supreme Court has held that a covenant restricting the activities of an employee after the termination of his employment is not violative of public policy only if it is "[1] partial or restrictive in its operation, either as to time or place, [2] on some good consideration, and [3][is] reasonable, that is, it afford[s] only a fair protection to the interests of the party in whose favor it is made." *Standard Register Co. v. Kerrigan*, 238 S.C. 54, 64-65 (S.C. 1961). Under South Carolina law, a post-employment covenant not to compete may be enforced solely upon the at-will employment itself, *Riedman Corporation v. Jarosh*, 290 S.C. 252, 349 (S.C. 1986); however, when a covenant is entered into after the inception of employment, separate consideration, in addition to continued at-will employment, is necessary in order for the covenant to be enforceable. *Poole v. Incentives Unlimited, Inc.*, 345 S.C. 378 (2001). South Carolina also requires additional consideration above and beyond continued employment in order for non-

5

compete covenants such as non-disclosure and employee non-solicitation covenants to be enforceable. *Nucor*, 482 F.Supp.2d at 729-730.

Accordingly, enforcing a covenant against competition which does not meet the "certain criteria" prescribed by South Carolina law would be contrary to the clear public policy of South Carolina. *See, e.g.*, *Nucor*, 482 F.Supp.2d at 729. The Court therefore finds that Ohio law is contrary to South Carolina public policy and should not be applied in this case.

### B. Breach of Contract under South Carolina Law

Because South Carolina law applies, the Agreement here is only valid if (1) the Agreement was entered at the commencement of Defendant's employment or (2) Defendant was given consideration in addition to continued employment when she entered the Agreement.

Plaintiff argues that Defendant entered the agreement at the inception of their employment with it. (Dkt. No. 46 at 5). Plaintiff argues that it acquired GlassPro on January 4, 2019 and Defendant signed the Agreement on January 11, 2019. (*Id.*) Plaintiff further argues that the Agreement's express language suggests that the Agreement is a condition of Defendant commencing employment with Plaintiff. (*Id.*) Plaintiff points to the following specific language in the Recitals of the Agreement: (a) "Employer and associate mutually desire to establish an employment arrangement"; (b) "In consideration of Associate's engagement as an employee of Employer, Associate desires . . ."; (c) "Associate acknowledges that the requirement to sign this Agreement is a condition to commencing Associate's employment with Employer." (Dkt. No. 1 at 9).

Defendant argues that she worked for Defendant before signing the agreement from January 4, 2019 to January 11, 2019. (Dkt. No. 45 at 8).

Plaintiff cites *Vaughn v. Gordian Medical, Inc.*, 2023 WL 2569437, at *3 (D.S.C. Mar. 20, 2023) to support its position that in the context of an acquisition by a new employer, South Carolina courts allow employment agreements to be signed shortly after the date of the acquisition. The court in *Vaughn*, did indeed find that the "new employer's decision to retain the prior company's executive leadership at the inception of her employment with the new entity was sufficient consideration to validate the Agreement." *Id.* But the court in *Vaughn* also continued its analysis and found that accelerated payments from unvested equity units served as sufficient consideration for the employee's consent to the agreement. *Id.* The Court also notes that the employee in *Vaughn* was an executive. *Id.*

Because South Carolina disfavors restrictive-post employment covenants, courts should critically examine and construe such covenants against the employers. *See Rental Uniform Serv. of Florence, Inc. v. Dudley*, 278 S.C. 674. Here, Plaintiff did sign the Agreement shortly after GlassPro was acquired like the employee in *Vaughn*; but unlike in *Vaughn*, Plaintiff did not receive any additional consideration. Additionally, Defendant here is not an executive of the company; therefore, the policy considerations that disfavor restrictive post-employment covenants weigh heavier in Defendant's favor. *See* 16 C.F.R. § 910.2 (adopting different approaches for senior executives than for other workers). Given the critical examination required by the Court and viewing the evidence in the light most favorable to Defendant, the Court finds there is a factual dispute as to whether the Agreement was entered into at the conception of Defendant's employment.

IV. **Conclusion**

For the reasons set forth above, the Court **DENIES** Plaintiff's motion for partial summary judgment (Dkt. No. 44).

                                                                       <u>s/ Richard Mark Gergel</u>
                                                                      Richard Mark Gergel
                                                                      United States District Judge

September 20, 2024
Charleston, South Carolina